NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CAPITAL MACHINE COMPANY, INC. AND INDIANA FORGE, LLC,**
*Plaintiffs/Counterclaim Defendants-Appellants,*

AND

**WILLIAM L. KOSS,**
*Counterclaim Defendant,*

v.

**MILLER VENEERS, INC.,**
*Defendant/Counterclaimant-Appellee,*

AND

**THOMAS A. MILLER, BENJAMIN R. MILLER, SALLY M. SANDO, ROBERT D. BRAND, INDIANAPOLIS VENEER WORKS, LLC, EGENOLF MACHINE, INC., AND MERRITT PLYWOOD MACHINERY, INC.,**
*Defendants/Counterclaimants-Appellees.*

---

2012-1288

---

Appeal from the United States District Court for the Southern District of Indiana in No. 09-CV-0702, Judge Jane Magnus-Stinson.

---

Decided:  April 15, 2013

---

PAUL B. OVERHAUSER, Overhauser Law Offices, LLC, of Greenfield, Indiana, argued for Plaintiffs/Counterclaim Defendants-Appellants.

MICHAEL A. SWIFT, Maginot, Moore & Beck, LLP, of Indianapolis, Indiana, argued for defendants/counterclaimants-appellees. With him on the brief were J. LEE MCNEELY, CYNTHIA A. BEDRICK, and CHARLES B. DAUGHERTY, McNeely Stephenson Thopy & Harrold, of Shelbyville, Indiana.

---

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

MOORE, *Circuit Judge.*

Capital Machine Company, Inc., et al. (Capital) appeal from the district court's grant of summary judgment that Miller Veneers, Inc., et al. (Miller) do not infringe the asserted claims of Capital's patents: U.S. Patent Nos. 5,562,137, 5,694,995, 5,701,938, 5,678,619, 5,819,828, and 7,395,843. Because the court incorrectly construed some claim terms, we *vacate* its grant of summary judgment and *remand*.

## I.    BACKGROUND

Capital's patents, which are all part of the same patent family, are directed to producing thin sheets of wood veneer from a portion of a log called a "flitch." The patents' specifications explain that "[a] flitch is formed by cutting a log down the middle along its longitudinal axis so that the plane formed by the cut defines a flitch mounting surface and the periphery of the log defines a veneer-

producing surface." '619 col.1 ll.52–55. One method of making wood veneer is to repeatedly move a flitch past a veneer slicing knife to cut individual sheets of veneer. The part of the veneer slicing machine that holds the flitch in place is called a "staylog."

Before cutting, the flitch must first be prepared so it can be mounted on the staylog. A conventional method of preparing the flitch is to cut axially-extending grooves that run the length of the flitch. The staylog has clamping members called "dogs" that extend from the surface of the staylog and are inserted into the grooves in the flitch. The dogs can be moved toward each other to pinch the flitch using the grooves, keeping it in place. The figure below, adapted from figures in the patents-in-suit, depicts a flitch mounted on a staylog using one stationary dog (134) and one movable dog (136).



Capital's patents purport to increase the yield of veneer obtained from each log by solving problems associated with conventional methods. Most notably, the patents address problems caused by the natural taper in flitches, which occurs because trees are thicker at the base and get thinner going up the trunk. When a tapered flitch is mounted on the staylog, its outer surface is not parallel to the cutting axis of the knife. As shown below, the first

several slices are thus not full length because the knife cuts only the thicker portion of the flitch. J.A. 860. This is undesirable because the outside portion of the log produces the best quality veneer. Capital's patents attempt to solve this problem by positioning the flitch so its outer surface is parallel to the axis of the knife. This can be done either by cutting deeper holes for the dogs in the thicker end of the flitch than in the thinner end *or* by rotating the staylog so that the flitch's outer surface is parallel to the slicing knife. *See, e.g.*, '137 patent col.2 ll.31–42.



Capital sued Miller for infringement. After the district court's Markman ruling, the parties stipulated to summary judgment of noninfringement. Capital appeals, challenging the court's construction of several claim terms. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.  DISCUSSION

We review the district court's claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Claim terms are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The two exceptions to this rule are: (1) when a patentee acts as his own lexicographer; or (2) when the patentee disavows claim scope either in the

specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). A statement in the prosecution history can only amount to disclaimer if it clearly and unambiguously disavows claim scope. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1370 (Fed. Cir. 2012). When construing claim in patents that derive from the same parent application and share common terms, "we must interpret the claims consistently across all asserted patents." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

## A.  "Flitch"

The district court construed the term "flitch" as "a portion of a log resulting from the log being cut along its longitudinal axis and thus *having a taper at the butt end of the log*." J.A. 12 (emphasis added). This term appears in every asserted claim. Capital argues that the court's construction is wrong because nothing in the specifications of the patents-in-suit limits a "flitch" to having a "taper" or a "butt end." Capital also contends that the fact that some of the asserted claims recite a "tapered flitch" demonstrates that a "flitch" is not necessarily tapered. Capital argues that, because a "flitch" need not be tapered, the term should not be construed to require a "butt end."

Miller argues that the patents-in-suit expressly define a "flitch" as being tapered. It points to the specifications' explanation that "because the tree trunk is naturally tapered, one end of the flitch is thicker than the other end, and consequently extends a greater distance from the mounting surface of the staylog. As a result, the veneer-producing zone of the flitch is frusto-conical . . . ." '137 patent col.1 ll.55–59. Miller further argues that the patents use the terms "flitch" and "tapered flitch" interchangeably. Miller points out that the '619 patent, which Capital admitted is limited to tapered flitches, nonethe-

less has claims that simply recite "a flitch" (e.g., claims 22–29).

Miller also argues that Capital disclaimed untapered flitches during prosecution of the patents-in-suit before the U.S. Patent and Trademark Office (PTO). During prosecution of the '619 patent, for example, Capital sought to overcome an anticipation rejection over U.S. Patent No. 5,101,874 (Weil) by arguing that Weil "does not disclose applicant's invention" because it "does not show, and is silent with respect to, tapered flitches and their cutting." J.A. 356. Miller argues that Capital's statements apply to some claims that simply recited "a flitch" with no mention of a taper. Miller points to similar characterizations of Weil during prosecution of other patents in the same patent family.

We agree that Capital disclaimed untapered flitches during prosecution of the patents-in-suit. The PTO rejected claims from the application that issued as the '619 patent as anticipated by Weil, including some claims that expressly recited "a tapered flitch" and others that recited only "a flitch." *See, e.g.*, J.A. 348 (claim 1); J.A. 351 (claim 22). In response to these rejections, Capital argued that Weil "does not show, and is silent with respect to, *tapered* flitches and their cutting." J.A. 356 (emphasis added). Capital then characterized its invention as removing veneer from a "tapered flitch":

> Weil '874 is completely silent with regard to the problem solved by applicant's invention, that is, *applicant's novel method and apparatus for removing veneer from substantially the entire outer veneer-producing surface of the frusto-conical or tapered flitch*, and mounting the flitch by means, such as applicant's novel dog arrangement, to maximize the wood left in the flitch and the rigidity of the flitch as presented for cutting. Applicant's novel method and apparatus provide

*maximal recovery of veneer from a tapered and frusto-conical flitch* with a simple and effective apparatus unlike anything disclosed by Weil '874.

J.A. 357–58 (emphases added).

In a subsequent office action response, Capital again emphasized that its invention "is directed to [a] method and apparatus for cutting veneer from a *tapered* flitch with minimal waste . . . ." J.A. 364 (emphasis in original). Capital reiterated that its invention differed from Weil because "[n]othing in [Weil] discloses or suggests use of a tapered flitch, or a method or apparatus for cutting veneer from the tapered out surface of a tapered flitch, or applicant's claimed method and apparatus for cutting veneer from the tapered outer surface of a tapered flitch." J.A. 366.

Capital made similar arguments during prosecution of the '938 patent, stating that "[n]othing in Weil '874 discloses or suggests use of a tapered flitch." J.A. 371. Capital's argument applied to some claims reciting "a flitch," rather than "a tapered flitch," demonstrating that Capital was unmistakably disclaiming untapered flitches. Similarly, during prosecution of U.S. Patent No. 5,868,187, an unasserted patent in the same family as the patents-in-suit, Capital again distinguished Weil because it does not disclose using tapered flitches. J.A. 381–83.

Through these prosecution statements, Capital sought to overcome anticipation rejections by arguing that its invention, unlike Weil, is directed to *tapered* flitches. Importantly, Capital made these arguments even with respect to claims that recited only "a flitch," and thus might not otherwise have been limited to a tapered flitch. This is a clear and unmistakable disclaimer of untapered flitches.

Because each patent-in-suit has clear and unmistakable prosecution history disclaimer in either a parent or a

child, we interpret the term "flitch" consistently across all the patents.[1] *See NTP*, 418 F.3d at 1293. We have held that the prosecution history regarding a claim term is pertinent when interpreting the same term in both later-issued and earlier-issued patents in the same family. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). Capital's disclaimer of scope during prosecution of some of the patents-in-suit therefore applies equally to limit the term "flitch" in the other patents-in-suit. We thus hold that the district court correctly construed the term "flitch" as "having a taper at the butt end of the log" for every patent-in-suit.

## B.  "Staylog-Engaging Zone"

The district court construed "staylog-engaging zone" as "[t]he portion of the flitch that includes holes of varying depths, as distinct from the veneer-producing zone." J.A. 18. This term appears in the asserted claims from of the '995 and '828 patents. Capital argues that the term should not be limited to being "distinct from the veneer-producing zone" or to "holes of varying depths."

We hold that the district court correctly concluded that the "staylog-engaging zone" must be "distinct from the veneer-producing zone." The plain language of the claims shows that the two zones are distinct. Both claim

---

[1]    Disclaimer during the prosecution of one patent applies to other patents in the same family when the patents are directly related, such as through a parent-child relationship. If the patents at issue are familial, but are not directly related, the question whether disclaimer applies will depend on the facts of the case. Based on the common use of the term "flitch" in the specifications of the patents-in-suit and their familial relationship to each other, we conclude that disclaimer applies equally to each asserted claim.

16 of the '995 patent and claim 15 of the '828 patent, for example, recite cutting a "hole that extends through the staylog-engaging zone to the veneer-producing zone." This is consistent with the patents' specifications, which state that holes used to secure the flitch to the staylog "extend from a flitch mounting surface to the veneer-producing zone so as to define a boundary between the veneer-producing zone and the staylog-engaging zone." '995 patent at [57]; '828 patent at [57].

We conclude, however, that the court erred by limiting the term to "holes of varying depths." Nothing in the term "staylog-engaging zone" requires varying depth holes, and both the '995 and the '828 patents disclose that cutting varying depth holes is just one possible way to orient a tapered flitch so that its outside surface is parallel to the slicing knife. These patents also disclose an embodiment in which the tapered flitch is mounted flat on the staylog, which is then rotated to orient the flitch parallel to the knife. '995 patent col.9 ll.60–64; '828 patent col.9 l.66–col.10 l.3. This embodiment does not require holes of varying depths.

## C. "Predetermined Pattern/Predetermined Position"

The district court similarly construed the terms "predetermined pattern" and "predetermined position" to require that the holes cut in the flitch to mount it to the staylog have varying depths. J.A. 18–19, 24. The term "predetermined pattern" appears in the asserted claims of the '995 patent and the term "predetermined position" appears in the asserted claims of '938 patent.

The plain and ordinary meaning of these terms does not require holes of varying depths. Furthermore, as discussed above, the '995 patent discloses an embodiment in which a tapered flitch is oriented parallel to the slicing knife by rotating the staylog. '995 patent col.9 ll.60–64. Varying depth holes would be unnecessary in that embodiment. Moreover, with respect to the term "predeter-

mined position," the '938 patent discloses an embodiment with holes of *equal* depth. '938 patent col.8 ll.31–42. The district court erred by construing these terms to require varying depth holes.

## D.  "Veneer-Producing Zone"

The district court construed "veneer-producing zone" as "[t]he portion of the flitch parallel to the veneer-slicing knife and from which veneer is cut, as distinct from the staylog-engaging zone." J.A. 16. Capital argues that this term should not be limited to being parallel to the veneer-slicing knife because the '828 patent is directed to *preparing* a flitch rather than slicing it, and thus the claims do not require a "veneer-slicing knife." Capital also contends that the "veneer-producing zone" need not be "distinct from the staylog-engaging zone."

We hold that the district court correctly construed this term. The '828 patent states that normally, when tapered flitches are mounted to a staylog, the veneer-producing zone is not parallel to the slicing knife. '828 patent col.7 ll.19–23. As a result, the patent states that "a need exists . . . to allow the flitch to be mounted on a staylog so as to orient the semi-cylindrical veneer-producing zone of the flitch parallel to the veneer slicing knife while the flitch mounting surface may be oriented at an angle to the staylog mounting surface." *Id.* col.2 ll.28–35. In the claimed invention, "the veneer-producing zone . . . is arranged with its axis of rotation parallel to the slicing knife." *Id.* col.7 ll.23–27. The patent thus defines the "veneer-producing zone" as being parallel to the slicing knife.

With regard to Capital's second argument, we conclude that the district court correctly construed "veneer-producing zone" as being distinct from the "staylog-engaging zone" for the reasons discussed above. We thus hold that the court correctly construed the term "veneer-producing zone."

### E.   "Dogs"

The district court construed the term "dogs" as "[d]evices *without movable parts* that apply force to grip or retain a flitch on the veneer slicer."  J.A. 14–15 (emphasis added).  This term appears in the asserted claims of the '137, '938, and '843 patents.

Capital argues that the patents do not restrict "dogs" to having no movable parts, and points out that the patents disclose "movable dogs."  Miller counters that the specifications disclose only dogs without movable parts.  Miller contends that "movable dogs" are simply dogs mounted on a pivotable arm, and thus may move themselves but have no movable *parts*.

The plain and ordinary meaning of "dogs" does not restrict the term to having no movable parts, and Miller points to nothing in the patents' specifications showing that Capital limited dogs in this way.  Although Miller is correct that having movable dogs does not mean that the dog *itself* has movable parts, this does not justify limiting the term in a way that is inconsistent with its plain meaning and is not supported by the intrinsic record.  We thus hold that the district court erred by restricting "dogs" to devices "without movable parts."

## III. CONCLUSION

We have considered the parties' other arguments on appeal and find them to be without merit.  Because the district court erroneously construed the terms "staylog-engaging zone," "predetermined pattern/predetermined position," and "dogs," we vacate the grant of summary judgment of noninfringement.  It is unclear from the district court's final judgment, however, whether the construction of any one claim term is case-dispositive.  We therefore leave it to the court on remand to determine whether, in view of this opinion, summary judgment of

noninfringement is appropriate with respect to any of the asserted claims.

## VACATED AND REMANDED

### COSTS

Each party shall bear its own costs.